**Avan KING, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 863–85.**

Court of Criminal Appeals of Texas, En Banc.

June 21, 1989.

George A. Preston, Denton, for appellant.

Jerry Cobb, Dist. Atty. and Jim E. Crouch and Fred Marsh, Asst. Dist. Attys., Denton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

Appellant pled guilty before a jury and was convicted of delivery of cocaine to an undercover peace officer; the jury assessed his punishment at six years confinement and did not recommend probation. In an unpublished opinion, the Fort Worth Court of Appeals affirmed his conviction.

This is a companion case to *Murphy v. State* (Tex.Cr.App., No. 102–86) and *Drew v. State* (Tex.Cr.App., No. 1168–86), both delivered this day.

At the punishment hearing following appellant's plea of guilty, evidence was adduced by the State showing on January 17, 1980, appellant sold just under a gram of cocaine from his residence to a narcotics officer of the Department of Public Safety. The State also tried to demonstrate in its case in chief that six days previously, other drug transactions not directly involving appellant occurred in his residence, and that two days after the sale of cocaine, on January 19, 1980, another sale was consummated between appellant and the same D.P.S. officer, of an undisclosed quantity of methamphetamine. In the face of appellant's objection to these extraneous events, the trial court excluded the State's proffered evidence. The State was allowed to elicit testimony of appellant's bad reputation for being peaceable and lawabiding.

Appellant presented evidence his current employers would keep him on in the event he should be granted probation. Appellant himself then took the stand. On direct examination he testified, not only that he had never been convicted of a felony, in satisfaction of his evidentiary burden to establish eligibility for probation; he added he had never "been convicted ... of any kind of misdemeanor that could send [him] to jail[.]" Appellant then asserted he had looked over terms of probation that might be imposed, that he would continue to work faithfully and support his dependents. In this context the following transpired:

"Q. All right. Another one of the terms would be that you commit no offense against the laws of this state or any other state or the government of the United States; you understand that?

A. Yes sir, I do.

Q. And could you tell us whether or not you would violate the laws of this state or any other state or the United States if you were placed on probation?

A. I would not.

Q. You understand the consequences of a violation?

A. Yes sir, I do.

\*     \*     \*     \*     \*     \*

Q. All right. And do you have any question in your mind as to whether or not you would commit future violations of the laws of this state?

A. No, I do not."

During appellant's crossexamination, the State requested a bench conference and proposed to question appellant relative to the delivery of methamphetamine on January 19. Appellant objected that evidence of such extraneous offense was irrelevant, so prejudicial as to deny him a fair trial, a denial of due process and violative of statutes relative to punishment. Opining that a person's future conduct is governed to some extent by how he has behaved in the past and that appellant had "opened up such inquiry" by his answers, the trial court permitted the prosecutor to elicit an admission that appellant delivered methamphetamine to the same officer two days after his delivery of cocaine.

In our opinion in *Murphy v. State,* supra, we have held that evidence of specific conduct is inadmissible at the punishment phase of trial, either to show the "character" or circumstances of the offender in general,\* or as relevant to "suitability" of the accused for probation, in the face of a timely objection. We further held, however, that the parties may "open the door" to admission of such evidence. In this cause, as in *Drew v. State,* supra, our inquiry focuses upon whether that door was opened. The court of appeals agreed with the trial court that it was. Slip opinion at 3–7. Under the circumstances here presented, we concur with that conclusion, and affirm.

By objecting to the extraneous delivery when the State first attempted to raise it in its case in chief, appellant indicated an unwillingness to admit evidence of specific conduct to inform jury discretion in deciding what punishment to assess and whether to recommend probation. However, appellant subsequently volunteered he had never suffered a misdemeanor conviction, and assured the jury he would refrain from future violations of the law. In our view these assertions of good conduct, past and future, were sufficient to open the door to the State's evidence of specific misconduct. Appellant will not be heard now to complain. *Murphy v. State,* supra, slip op. at p. 27.

It is true the specific act of misconduct the State proved here occurred just two days after the offense for which punishment was being assessed, and between the identical parties. Thus, it is not particularly compelling evidence to rebut appellant's assertions he could prospectively abide by the law. Nevertheless, the extraneous offense did show the delivery of cocaine was not a purely isolated event, and that appellant had more than casual access to a variety of contraband. That evidence of past acts may have probative value in gauging probable future conduct is well founded in

---

\* This Court has long held that Article 37.07, § 3(a), V.A.C.C.P., applies to punishment hearings following a plea of guilty before a jury.

*Basaldua v. State,* 481 S.W.2d 851 (Tex.Cr.App. 1972).

our capital jurisprudence. E.g., *Garcia v. State*, 581 S.W.2d 168, 179 (Tex.Cr.App. 1979). Analogously, past conduct may have probative value to show that an accused's prediction as to future compliance with the law is unduly optimistic. We cannot say the tendency of the extraneous delivery evidence to rebut appellant's assertions here was so minimal that the trial court abused its discretion in admitting it, once the door was opened.

Accordingly, the judgment of the court of appeals is affirmed.

WHITE and BURCHELMANN, JJ., concur in the result.

MILLER, J., dissents, and would follow the rationale of his opinion on original submission in *Murphy v. State*, (Tex.Cr.App., No. 102–86, opinion on rehearing delivered this day).

CAMPBELL, J., dissents.

DUNCAN, J., not participating.

TEAGUE, Judge, dissenting.

Finding that the past history of this case might be of benefit to the reader, its history is set out in footnote one.[1]

Because I believe this Court makes an unjust decision in holding that appellant

---

1. In February, 1982, in an unpublished panel opinion, this Court ordered this cause dismissed for want of jurisdiction in this Court because there was no notice of appeal in the record of appeal. *King v. State*, 629 S.W.2d 956 (Tex.Cr. App.1982).

Thereafter, the Fort Worth Court of Appeals, acting pursuant to its newly acquired criminal appellate jurisdiction, granted appellant an out-of-time appeal because he had been denied the effective assistance of counsel on appeal. See *King v. State*, 634 S.W.2d 794 (Tex.App.–2nd 1982).

After appellant was granted the out-of-time appeal, in *King v. State*, 656 S.W.2d 617 (Tex. App.–2nd 1983), the Fort Worth Court of Appeals reversed the trial court's judgment and sentence, holding that the trial court erred in not granting appellant's motion to quash the indictment because the indictment did not allege an offense in such specificity as would serve as an adequate bar to future prosecutions for the same offense.

This Court thereafter granted the State's petition for discretionary review and, after holding that appellant, by pleading guilty, waived any right to appeal the trial court's ruling on the motion to quash the indictment, remanded the cause to the Fort Worth Court of Appeals "for consideration of appellant's other grounds of error." *King v. State*, 687 S.W.2d 762 (Tex.Cr. App.1985). This Court did not decide the issue whether the court of appeals had jurisdiction to grant appellant an out-of-time appeal. See, however, the dissenting opinion that I filed in that cause, which asserts that the court of appeals did not have jurisdiction to grant appellant an out-of-time appeal.

On remand, the court of appeals, in an unpublished opinion, see its opinion in *King v. State*, No. 2–82–093–CR, June 12, 1985, addressed appellant's remaining contentions by consolidating them into the following assertion: "[T]he trial court reversibly erred in admitting an unadjudicated extraneous offense at the punishment stage of the trial as impeachment testimo-

ny." (Page 2 of slip opinion.) The court of appeals pointed out that the trial judge ruled as he did because "he believed that a person's future conduct is governed to some extent by how he has behaved in the past and that appellant's counsel had opened up such inquiry by his question as to whether he [appellant] would violate the law in the future." It then ruled that the trial judge correctly ruled that it was permissible for the prosecuting attorney to cross-examine appellant about the extraneous unadjudicated misdemeanor criminal offense of selling methamphetamine. The court of appeals relied totally upon *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App.1972), and some of *Albrecht's* progeny, as its authority. It did not, however, rely upon the concept that appellant had "opened the door" to such cross-examination.

This Court in *Albrecht*, without citing any authority to support what it did, but acting legislatively, amended the provisions of Art. 37.-07, V.A.C.C.P, to also provide that "Evidence legally admissible to mitigate punishment or evidence that is relevant to the application for probation, if any, is also admissible."

The court of appeals opinion in this cause makes it clear to me, if no one else, that it did not decide the issue on whether appellant "opened the door", but decided the issue solely on what this Court had stated and held in *Albrecht*, and in *Albrecht's* progeny, and ruled that the prosecuting attorney's cross-examination was proper because of what was stated and held in those cases. Today's majority opinion by Judge Clinton, however, decides the issue on the basis that appellant "opened" the door to the prosecuting attorney's cross-examination.

What is so remarkable, to me at least, about the majority opinion's holding probably lies in the fact that Judge Clinton writes the majority opinion. Judge Clinton has been the Court's staunchest advocate of the principle that unless and until the court of appeals first writes on an issue, this Court should not write on that issue. See and compare the opinions that Judge Clin-

"opened the door" to being impeached during cross-examination by the prosecuting attorney, by the use of an extraneous unadjudicated misdemeanor criminal offense of sale of methamphetamine, I am compelled to file this dissenting opinion.

I emphasize that what was decided in *Murphy v. State* (Tex.Cr.App., No. 102–86, delivered this date), and *Drew v. State* (Tex. Cr.App., No. 1168–86, delivered this date), concerning the provisions of Art. 37.07, V.A.C.C.P., as that statute existed when appellant was assessed his punishment in this cause, does not implicate the issue in this cause, which is whether appellant "opened the door" when he testified on direct examination to the prosecuting attorney's cross-examination about the unadjudicated misdemeanor criminal offense. Therefore, anything stated in *Murphy* and *Drew*, that might implicate the issue that is before this Court to resolve in this cause, is pure dicta.

The record before us reflects that appellant pled guilty to a jury of Denton County to committing the felony offense of delivery of cocaine to a State undercover narcotics agent. The jury rejected his application for probation and assessed his punishment at six years' confinement in the Department of Corrections.

Judge Clinton, in writing for the majority of this Court, notwithstanding the fact that the provisions of Art. 37.07, V.A.C.C.P., as literally read when the trial of appellant occurred, did not allow the prosecution to elicit evidence or testimony about any prior unadjudicated criminal offenses, either directly or indirectly unless the defendant "opened the door", concludes that appellant "opened the door" to such cross-examina-

tion, by the unobjected to questions and answers that his trial attorney asked and that he gave, and he "will not be heard now to complain" about the State obtaining, during cross-examination, testimony "that appellant delivered methamphetamine to the same officer two days after his delivery of cocaine [for which he was tried and convicted]." (Page 303 of opinion.)

The record is clear, however, see "Appendix A" which is attached hereto, that the prosecuting attorney did not object to appellant's trial counsel asking appellant about whether he would in the future violate any laws of this or any other State, or of the United States, nor did the prosecuting attorney object to appellant's answers that he would not, in the future, violate any such laws. Because the prosecuting attorney failed to object to the above questions and answers, the State should have been estopped in the trial court from asserting that these questions and answers "opened the door" to cross-examining appellant about the misdemeanor criminal offense of selling methamphetamine that he had previously committed but had not been convicted of. Furthermore, the record makes it perfectly clear to me, if no one else, that at no time did appellant "open the door" to being impeached during cross-examination about any past unadjudicated criminal offenses because of the questions asked by his trial attorney and the answers that he gave to those questions. The sole basis for the trial judge permitting the prosecuting attorney to ask appellant on cross-examination about the commission of the past unadjudicated misdemeanor criminal offense of selling methamphetamine was because he concluded that when appellant's trial coun-

---

ton has filed in *Gamez v. State,* 737 S.W.2d 315 (Tex.Cr.App.1987); *Brown v. State,* 741 S.W.2d 453 (Tex.Cr.App.1987); *Arnold v. State,* 742 S.W.2d 10 (Tex.Cr.App.1987); *Gollihar v. State,* 741 S.W.2d 458 (Tex.Cr.App.1987); *Rowland v. State,* 744 S.W.2d 610 (Tex.Cr.App.1988); and *Davis v. State,* 721 S.W.2d 857 (Tex.Cr.App. 1986). And there are many others in which Judge Clinton has written on this subject. Therefore, I am compelled to ask Judge Clinton the same question he asked me in the dissenting opinion that he filed in *Rowland,* which I authored for the Court: Why does this Court do

the work of the Fort Worth Court of Appeals? Given the fact that the court of appeals' ruling was not based on the rationale that appellant "opened the door", would it not be proper for this Court to continue this cause in appellate orbit a little bit longer by remanding it to the court of appeals so that that court can first decide whether appellant waived his claim of error by "opening the door?" I believe so. Who knows? By remanding this cause to the court of appeals, and keeping it in appellate orbit a little bit longer, the slow moving meteor named "justice" might actually strike it.

sel asked appellant the question, whether he would in the future violate any laws of this State, any other State of the Union, or of the United States, and appellant answered the question in the negative, appellant "opened the door" to being cross-examined about the extraneous unadjudicated criminal offense. (Pages 57–59, Statement of Facts). Of course, if there was any affirmative evidence in the record from appellant, that in the future he would or might violate the laws of this State, other States of the Union, or of the United States, whether this constituted "opening the door" would be another issue to resolve. However, as to future criminal conduct, the record is undisputed that all that appellant did was voice his subjective belief that he would not in the future, "to the best of his ability," commit any criminal wrongs. Where the prosecuting attorney is foolish enough to permit such questions to be asked and answered, why should the State later be permitted to take advantage of these unobjected to questions and answers?

I find that the majority opinion actually amounts to a return to the day when this Court handed down *Childs v. State*, 491 S.W.2d 907 (Tex.Cr.App.1973). In all due respect to Hon. Winston Cochran, an assistant district attorney of Harris County, who has stated several times that he believes that the majority opinion of *Ex parte Patterson*, 740 S.W.2d 766 (Tex.Cr.App.1987), is "arguably the worst decision this Court has ever issued", see, for example, page 5, State's petition for discretionary view filed in *Carvey v. State*, Court of Criminal Appeals No. 0900–88, and in all due respect to the individuals who were on this Court at that time, and in all due respect especially to Judge Morrison, the author of *Childs*, I find that *Childs* arguably might be the worst decision this Court has ever handed down since it came into existence. It took almost ten years before an enlightened majority of this Court found its way to expressly overrule *Childs* in *Ward v. State*, 591 S.W.2d 810 (Tex.Cr.App.1980). The essential holding of *Childs* was that if a defendant put on a witness at the punishment stage of a non-capital felony trial, such as his mother, father, grandfather,

grandmother, aunt, uncle, brother, sister, wife, child, or just a good friend, and without objection from the prosecuting attorney the witness was asked whether the defendant was "a good old boy" or "a good old girl", if the prosecuting attorney was slick enough he could convert the witness into a reputation witness and could then ask the witness "have you heard" questions concerning the defendant's criminal past, and done so with the approval of this Court. After *Childs*, defense attorneys became so frightened about the consequences of putting on a witness at the punishment stage of the trial that most of them declined to put on any evidence at the punishment stage of the trial. Even today, in capital murder cases, the effects of *Childs* are still being felt because, given the provisions of Art. 37.071, V.A.C.C.P., it is the unusual case, for fear that he will "open the door" to "have you heard" questions by the prosecuting attorney, that a defense attorney will offer "mitigating evidence" on behalf of the defendant.

The majority opinion in this cause correctly points out what Judge Woodley recognized over 25 years ago in the opinion that he filed in *Rojas v. State*, 404 S.W.2d 30, 34 (Tex.Cr.App.1966), that "evidence of specific [criminal] conduct is inadmissible at the punishment phase of trial, either to show the 'character' or circumstances of the offender in general (asterisk footnote deleted), or as relevant to .'suitability' of the accused for probation, in the face of a timely objection." (Page 303 of opinion.) However, the majority opinion in this cause goes on to hold that in this instance, because appellant "opened the door", the prosecuting attorney was entitled to cross-examine appellant about an unadjudicated extraneous misdemeanor criminal offense.

By the majority opinion, the question that must be answered in this cause is whether appellant "opened the door."

On direct examination, appellant testified, inter alia, that he had never been convicted in this or any other State, or of the United States, of any kind of felony offense, or misdemeanor offense that carried a jail sentence; that he admitted his

guilt to the primary offense; that he worked for a certain company and would in the future work faithfully at suitable employment; that he had supported his three year old child, and would do so in the future; that he had gone over the conditions of probation; that he understood the consequences of violating any condition of probation; and that he would not in the future violate any law of Texas, any law of any other State of the Union, or of the United States. Did the latter subjective question and subjective answer that appellant gave "open the door" to permitting the prosecuting attorney to cross-examine appellant about the prior unadjudicated extraneous misdemeanor criminal offense of selling methamphetamine that appellant had committed in the past? Logically I don't see how. Perhaps, however, the quicksand foundation on which the majority opinion rests lies in the fact that it cites as authority for its holding this Court's decision of *Garcia v. State*, 581 S.W.2d 168 (Tex.Cr.App.1979), a death penalty case which I appealed when I was in private practice. Appellant's case, however, is not a death penalty case. Furthermore, it is now elementary that the provisions of Art. 37.071, V.A.C.C.P., govern the admissibility of evidence at the punishment stage of a capital murder case, and under this Court's decisions it is permissible for a trial judge to admit into evidence extraneous unadjudicated criminal offenses at the punishment stage of the trial where death is a possible punishment, as well as the kitchen sink. Winston Cochran, given the fact that you and I like to keep tract from our respective positions what we believe are arguably this Court's worst decisions, are you listening? Because *Garcia* held that the State is not even required to establish beyond a reasonable doubt at the punishment phase of a capital murder case that the defendant committed the extraneous criminal wrong, notwithstanding that I appealed Garcia's case, I believe that *Garcia* probably should rank in the top ten of this Court's worst decisions. To say that "Analogously, past conduct may have probative value to show that an accused's prediction as to future compliance with the law is unduly opti-

mistic", as the majority opinion in this cause does, is, given the differences between what is admissible at the punishment stage of a capital murder case and what is admissible under Art. 37.07 at the punishment stage of a non-capital murder case, as here, ludicrous.

The concept of an attorney "opening the door" to what would otherwise be inadmissible evidence or testimony on cross-examination is based upon the fact that once the opposing party has opened an inquiry into a particular subject, that party cannot complain when the other party desires to go into the details of that subject. See Art. 38.24, V.A.C.C.P., which provides, in pertinent part: "When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other party." For example, the general rule is that neither party can show the details of criminal offenses resulting in final convictions offered at the punishment stage of a non-capital case under the provisions of Art. 37.07. However, if the State on cross-examination "opens the door" into why he pled guilty to the offense, the defendant is entitled to fully explore the issue, including bringing out favorable details why he pled guilty. See *Parr v. State*, 557 S.W.2d 99 (Tex.Cr.App.1977). Evidence which is used to fully explain a matter opened up by the other party need not be ordinarily admissible. *Parr, Id.* The "opening of the door" rule applies with equal force to either the prosecution or the defense. *Parr*, Id.

The more common example of when a defendant might "open the door" to what would otherwise be improper cross-examination is when the defendant makes a blanket statement, such as "I have never before been in any kind of trouble with the law", "I have never before been convicted of any kind of crime", or "I have never before done anything like this." In *Eloms v. State*, 264 S.W.2d 725 (Tex.Cr.App.1954), this Court observed:

Prudence favors a showing by the accused that he is eligible under the suspended sentence law, enjoys a good repu-

tation as a law abiding person, and no more. If he goes further and makes blanket statements about exemplary conduct, then the State may refute them. When the defendant or a State's witness makes blanket statements about exemplary conduct, he "opens the door" to being impeached by relevant questions that would show that he has left a false impression with the jury of just what his past criminal conduct might have consisted of, i.e., the witness has "opened the door" by giving an erroneous impression about his past criminal conduct. Also see *Trippell v. State*, 535 S.W.2d 178 (Tex.Cr.App.1976), where the State's witness represented himself as a law-abiding citizen who was only aiding the Sheriff's Department out of a sense of civic duty and the witness denied that he had ever been convicted, and this Court held that it was reversible error for the trial court to deny the defendant the right to cross-examine the witness as to prior criminal convictions and other relevant matters that would tend to reflect on the witness' bias, prejudice, and ulterior motives.

As previously pointed out, the court of appeals ruled, not that appellant "opened the door" to the prosecuting attorney's questioning him about the prior unadjudicated extraneous criminal misdemeanor offense of selling methamphetamine to another individual, but that such cross-examination was permissible pursuant to this Court's decision of *Albrecht*, and its progeny. Today, however, the majority opinion holds that appellant "opened the door" to such cross-examination because he gave a subjective negative answer to a subjective question his attorney asked him, whether he would in the future engage in criminal conduct that would constitute a violation of the laws of this or any other State of the Union, or of the United States. The prosecuting attorney did not object either to the question or the answer.

It has been stated that whether an applicant for probation in a non-capital case has a trait or propensity to violate the law in the future is not relevant to a material issue raised by the application for proba-

tion in a non-capital punishment proceeding before a jury. For that matter, neither is a declaration by applicant that he will not violate the law if placed on probation. The theory on which the trial court in this instance allowed the prosecution to cross-examine appellant is untenable.

Again, we are not dealing with a capital murder case, where this Court has held that virtually anything, including the kitchen sink, is admissible evidence in order for the jury to answer the question whether there is a probability that the defendant would commit criminal acts of violence in the future that would constitute a continuing threat to society. See Art. 37.071. All that appellant professed on direct examination is that he would not if the jury recommended that he be placed on probation commit in the future any criminal wrongs; he did not profess that he had not, excluding the crime for which he was convicted, committed any other criminal wrongs. Had he done so, of course, he would have "opened the door." Also, if he had testified that he had not since the day he was arrested committed any criminal wrongs, he would have "opened the door." But he did not so testify.

Thus, on what basis did appellant "open the door"? The majority opinion holds that "In our view [appellant's] assertions of good conduct, past and future, were sufficient to open the door to the State's evidence of specific misconduct." (Page 303 of opinion.)

Appellant, in his petition for discretionary review, pointed out that for the prosecuting attorney's cross-examination to have been proper, it was necessary that it "relate in some manner to the application for probation ... In other words ..., the relevance of the offered evidence must be judged on the basis of whether it has the possibility of resolving an issue presented by the application for probation." (Page 6, Appellant's Brief on Discretionary Review.) Appellant also correctly pointed out that "The only matter that could be disputed in the Appellant's Application for Probation is whether he had ever been convicted of a felony in Texas or elsewhere. The cross-

examination question that raised the existence of another offense could not have contributed to the determination of that issue. Evidence that the Appellant violated the law following his arrest in the case being prosecuted could not have shown whether the Defendant had ever been convicted of a felony ... In the case at bar, none of the Appellant's testimony attempted to leave an impression with the jury that he had not previously committed criminal acts." *Id.*, at pp. 6–7.

Appellant did not "open the door" to the cross examination that occurred. Therefore, I respectfully dissent to the contrary holding by the majority opinion.

## APPENDIX A

### AVAN KING,

called as a witness in his own behalf, being first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows:

### DIRECT EXAMINATION

BY MR. LEVY:

Q. Would you state your name, please, sir?

A. Avan King.

Q. Mr. King, where do you reside?

A. 312 Price, Lewisville, Texas.

Q. And you are going to need to speak up just a little bit. Okay?

A. All right.

Q. Now, Mr. King, first, let me ask you this, have you ever before been convicted in this state of any kind of felony?

A. No.

Q. Have you ever before been convicted in any other of the forty-nine states of any kind of felony?

A. No, I have not.

Q. Have you ever been convicted before by the government of the United States of a felony?

A. No, I have not.

Q. Have you ever been convicted in this state of any kind of misdemeanor that could send you to jail?

A. No, I have not.

Q. You understand that question excludes traffic tickets?

A. Yes.

Q. Have you ever been convicted in any other state or by the government of the United States of any kind of misdemeanor that could send you to jail?

A. No, I have not.

Q. All right. Now, Mr. King, on the 17th day of January, 1980, did you deliver to Mr. Humphreys the cocaine that I think Mr. Valdez brought in?

A. Yes sir.

Q. All right. How old a person are you?

A. Twenty-five.

Q. Do you work at the Fire Protection company?

A. Yes sir, I do.

Q. Fulltime?

A. Yes sir.

Q. All right. Mr. King, do you have any dependents?

A. Yes, I do.

Q. And do you support your dependents?

A. Yes, I do.

Q. Have you ever gone over—had an opportunity to look over the terms of probation that the Court might impose upon you?

A. Yes sir, I have.

Q. Course one of those would be that you work faithfully at suitable employment.

A. Yes sir.

Q. Will you continue to work faithfully at suitable employment?

A. Yes sir.

Q. All right. Another one of the terms would be that you commit no offense against the laws of this state or any other

state or the government of the United States; you understand that?

A. Yes sir, I do.

Q. And could you tell us whether or not you would violate the laws of this state or any other state or the United States if you were placed on probation?

A. I would not.

Q. You understand the consequences of a violation?

A. Yes sir, I do.

Q. All right. Now, another one of your requirements would be that you support your dependents, and you do have dependents, is that right?

A. Yes sir.

Q. And is that—where do those dependents reside?

A. Chicago, Illinois.

Q. All right. Despite the fact—is it a child?

A. Yes sir.

Q. How old is the child?

A. Three years old.

Q. All right. And how long has the child lived in Chicago?

A. For one year.

Q. Despite the fact that the child is in another state, have you continued to pay your child support regularly and on time?

A. Yes sir, I have.

Q. There is a divorce, is that right?

A. Yes sir.

Q. And did you agree that your wife should have custody?

A. Yes, I did.

Q. All right. And have you provided for the child to come and visit you in Texas on occasions?

A. Yes sir, I have.

Q. And have made arrangements that the child when he came to Texas could visit with its mother-in-law?

A. Yes sir, I have.

Q. Or with its grandmother, your mother-in-law?

A. Yes, I have.

Q. You understand that the jury here that's seated to determine your fate could assess any term of years from five years probation to life, is that right?

A. Yes sir.

Q. All right. And do you have any question in your mind as to whether or not you would commit future violations of the laws of this state?

A. No, I do not.

Q. Do you have any quarrel with the testimony that the State presented through Mr. Humphreys as to the fact that you did sell him this cocaine?

A. No sir.

MR. LEVY: All right. I pass the witness.

MR. MARSH: At this time, Your Honor, the State asks the jury be removed.

THE COURT: All right. Take the jury out.

(THEREUPON THE JURY WAS
EXCUSED FROM THE
COURTROOM)

MR. MARSH: At this time, Your Honor, I propose to ask the question propounded to the agent to this witness, based on his testimony that he has no doubt that he would not violate the laws of this state if he's placed on probation, I think that his past conduct indicates just the opposite.

THE COURT: Defense want to be heard?

MR. LEVY: Yes, I certainly do. That is a rather peculiar notion, because if you take that argument, then you could say as to any extraneous offense or any misconduct, however remote, that might go to his future conduct, and certainly as a matter of—you know, you get into the kind of situation where—well, semi-psychiatric testimony of whether or not somebody who has continually violated the laws is likely to do it in the future, but the fact that, you know, there is no expert testimony on that, all he said is that he intends to abide by the terms of probation, and that certainly doesn't open up all his past conduct.

THE COURT: Well, he answered undoubtedly it would. This isn't opening it up? You are the one that brought that up, whether or not he would continue to violate the law.

MR. LEVY: How does that open it up, that somebody has an intention to abide by the law in the future and allow the State to introduce extraneous offenses? If that opens it up, then he could never testify as to what his intention was.

THE COURT: Well, I think he can't, if he brings into—if it then becomes an issue. If his intention can be governed to some extent by what his past conduct was—I think that's common sense that your future conduct is governed to some extent by how you have operated in the past.

MR. PRESTON: Judge, that wouldn't be relevant, and we know that's admissible in a capital cases, but obviously this isn't a capital case; I just don't believe there's any case law on it, there's no—

THE COURT: I agree, I don't believe there is.

MR. PRESTON: There is not a syllable as to the admissibility of this kind of testimony as to its relevancy, and the prejudicial value is so high as to utterly deny this defendant a fair trial.

THE COURT: I'm going to overrule the objection. I believe you opened it up by your question as to whether he would violate the law in the future or not.

MR. LEVY: Then the—I assume the State could then go back and ask him any violations that he has committed in the past.

THE COURT: No. He only proposes to ask him these that occurred there in the immediate time situation within a few days of this transaction, which I believe you have opened up and would be of some probative value in determining by this jury whether or not he would violate the law in the future.

MR. PRESTON: The question is from this date, if the jury grants the probation, from this date would you violate the law in the future.

THE COURT: I know it. In order to arrive at that decision you can look to his conduct, and when you asked him if he would violate it in the future, I believe you opened it up by this line of questioning, so I'm going to overrule the objection.

MR. PRESTON: We are going to very strongly except to that, this is an absolute utter denial of any kind of fair trial to this defendant, and we object to that.

THE COURT: I will give you your strongest objection.

MR. LEVY: I'm going to object to it as an effort to prove an extraneous offense without making proof of the extraneous offense, that is, that it is a denial of due process because it's in an effort to punish the defendant for unadjudicated offenses that might have occurred in the past, in that it deprives the defendant of due process under the state and federal constitutions, in violation of state statutes with relation to punishment, and it further denies him confrontation as to the extraneous offenses, and for those reasons we object.

THE COURT: You can have all those objections. Bring the jury back. If you want, you don't have to make them at the time unless you want to. I will let you have that objection to any of the questions about the—

MR. LEVY: Well, I would like to make—I do have one other than that.

THE COURT: All right.

MR. LEVY: Just real briefly, that—

THE COURT: Wait just a minute before you bring the jury back, we got one other matter to be taken up outside the jury's presence.

MR. LEVY: Depending on what the State proposes to ask, we will probably ask some questions on redirect, and I want to make it clear for the record we do not waive the objections that we have made, that any questions we ask relating to the same subject in our view is solely in answer to inadmissible evidence that has been introduced by the State in this case, therefore just for the purpose of the record—

THE COURT: We will note that's your intention. Course if it does, it does, the

facts will just have to speak for themselves.

MR. LEVY: Well, I just want to make it clear I don't intend to waive that.

MR. PRESTON: Our position is this puts us in a position of Harrison vs. New York, and it's an intolerable situation—

THE COURT: Well, if it does—

MR. PRESTON: —from an evidentiary point of view.

THE COURT: If it does, the facts will have to speak for themselves, but I will certainly note and I'm sure the appellate court will if it comes to that, we will note that you have that intention. Whether or not that waives it or not would just be a fact situation. All right. Bring the jury back.

(THEREUPON THE JURY RETURNED INTO THE COURTROOM)

THE COURT: All right, Mr. Marsh.

Q. (By Mr. Marsh): Now, then, you stated that if the jury granted you probation in this case that you had no doubt that you would not violate the laws of the State of Texas or of the United States?

A. To the best of my ability, yes sir.

Q. And let me ask you this in that regard, in regard to the offense with which you have pled guilty today, that was a violation of the law, wasn't it?

A. Yes sir, it was.

Q. And, further, in regard to the—on the 11th day of January when officer Humphreys came to your house, there was at least one violation in your presence of the law on that date, is that correct?

A. Yes sir.

Q. All right.

MR. PRESTON: Would the Court note our objection to this, and ask the jury be instructed to disregard that answer?

THE COURT: All right. Was this—you all approach the bench just a minute.

(CONFERENCE AT BENCH)

THE COURT: Clarify that so they can withdraw their objection.

Q. Okay. To talk about the 11th day of January when you first saw the agent in this case, the marijuana was being smoked in your residence there when he entered according to his testimony?

MR. PRESTON: We withdraw the objection to that.

THE COURT: All right. You may answer.

A. Yes sir.

Q. All right. And then prior to your arrest for this charge, did you have another meeting with officer Humphreys?

MR. PRESTON: To which we will object, Your Honor, on the grounds previously stated.

THE COURT: Yes. I will continue my overruling of that. You may answer.

A. What was the question again, sir?

Q. All right. Prior to your arrest in this case and after the sale that you made to detective Humphreys on the 17th day of January, 1980, did you meet detective Humphreys on another occasion?

A. The 11th of January.

Q. Did you meet him after the 17th?

A. Yes sir, I did.

Q. All right. And in—and was that in regard to the conversation that you had in your house on the 17th of January?

A. No sir. It was in—had to do with a phone call.

Q. A phone call that was made to you?

A. Yes sir.

Q. Did you at that time in Dallas County, Texas, make a delivery of methamphetamine to detective Humphreys?

MR. PRESTON: To which we will object—

THE COURT: All right. I will overrule the objection.

MR. PRESTON: —on the grounds which we previously stated our objections.

THE COURT: I will give you all the previous grounds that you stated, and I still overrule it.

A. Yes sir.

MR. PRESTON: We'd ask the jury at this time to be instructed to disregard his testimony that he just gave.

THE COURT: All right. I will overrule that.

MR. PRESTON: We make a motion for mistrial.

THE COURT: Overrule the motion for a mistrial.

Q. And in that regard, on each of these occasions you were in violation of a law of the State of Texas and of the United States?

A. Yes sir, I was.

Q. And yet you are asking this jury to grant you probation and telling the jury if they do grant you probation you won't violate any more laws?

A. To the best of my ability I will not.

MR. MARSH: No further questions of this witness.

### REDIRECT EXAMINATION

BY MR. LEVY:

Q. Mr. King, you understand the serious nature of the charges that the State has made against you, don't you?

A. Yes sir, I do.

Q. And when you say "to the best of your ability", you understand and we have discussed, have we not, the fact that if your ability fails you that you will not be entitled to another jury trial if you violate the terms of your probation?

A. Yes sir, I understand.

Q. Are you afraid of going to prison?

A. Yes sir.

Q. Are you telling the jury the truth, that you are going to make a sincere effort to live according to the laws of the State?

A. Yes sir, I am.

Q. Do you think you can be a productive member of this society?

A. Yes sir, I do.

Q. Have you learned anything from being on trial?

A. Yes sir.

Q. Have you heard the term "easy money"?

A. Yes sir, I have.

Q. Has the trial taught you there is no such thing?

A. Yes sir.

MR. LEVY: I will pass the witness.

### RECROSS EXAMINATION

BY MR. MARSH:

Q. Am I correct in my mathematics that based on $14.71 an hour your annual income would be in excess of $25,000.00?

A. Yes sir.

Q. Okay. And yet you still persisted in dealing in drugs, is that correct?

A. It was so said, yes.

Q. Based again on my figures, a quantity of cocaine, based on the dollar a gram price, would be $2840.00 an ounce, and that would come to 45—in excess of $45,000.00 a pound for cocaine, based on the sale price that you and detective Humphreys arrived at out there at your house, is that correct?

A. I believe so, yes sir.

Q. Now, I believe you stated that you and your wife were divorced, is that correct?

A. Yes sir.

Q. Where did that divorce take place?

A. Denton County.

Q. All right. Were you represented by counsel?

A. No sir.

Q. Was she represented by counsel?

A. Yes sir.

Q. They explain to you that any terms that the judge imposed on you as to child support could be enforced?

A. Yes.

Q. They explain to you that even though she was out of the state, that those terms could be enforced under what's commonly called the reciprocal child support act?

A. Yes sir.

Q. And they explained to you at least one remedy that the court has if you are found in violation of those orders of the court, is to send you to jail for contempt of court—did they explain that to you, for violating the orders of the court?

A. I do not remember, but I'm sure that it was.

Q. Okay. So let me ask you just as a matter of fact—no.

MR. MARSH: I have no further questions.

THE COURT: Anything else, Mr. Levy?

### FURTHER REDIRECT EXAMINATION

BY MR. LEVY:

Q. Mr. King, I'd like to ask you just two more questions. Has anyone ever had to bring any kind of enforcement order against you to enforce your child support?

A. No sir, they have not.

Q. Do you love your child?

A. Yes, I do.

Q. Do you follow all the orders that the court made?

A. Yes sir.

Q. And it was all agreed to by you?

A. Yes sir.

MR. LEVY: All right. I will pass the witness.

MR. MARSH: I have nothing further.

\*    \*    \*    \*    \*    \*

### BARBARA TAYLOR,

called as a witness for the defendant, being first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows:

### DIRECT EXAMINATION

BY MR. PRESTON:

Q. Will you tell the jury your name, please, ma'am?

A. Barbara Taylor.

Q. Ms. Taylor, where do you live?

A. Plano, Texas.

Q. Do you know the defendant in this cause, Avan King?

A. Yes, I do.

Q. How long have you known him?

A. Since '73.

Q. In fact is he your ex-son-in-law?

A. Yes, he is.

Q. You have a granddaughter?

A. Yes, I do.