**Jack Donald BAXTER, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 11–85–132–CR.**

Court of Appeals of Texas,
Eastland.

July 17, 1986.

Rehearing Denied Aug. 14, 1986.

---

**5.** *Hunt v. Bass*, 657 S.W.2d 154 (Tex.App.— Houston [1st Dist.] 1983).

Jim Lane, Michael Logan Ware, Lane, Lane, Ware & Reyes, Fort Worth, Emilio Davila, Jr., Laredo, for appellant.

John Neal, Dist. Atty., Graham, for appellee.

Opinion

McCLOUD, Chief Justice.

The jury convicted appellant of attempted aggravated manufacture of methamphetamine and assessed punishment at confinement in the Texas Department of Corrections for 50 years and a $25,000 fine. We reverse and remand for a new trial.

Federal and State law enforcement agencies were investigating appellant's involvement with clandestine laboratories used to manufacture illegal drugs. On December 20, 1984, several officers executed search warrants for a trailer house located behind a club east of Breckenridge, Texas, and a warehouse located in downtown Breckenridge. One group of officers followed appellant from the warehouse to the club. Appellant was arrested as he got out of his

car. Appellant consented to the search of the trailer house and went inside the trailer house with the officers.

Inside the trailer house, the following was found: two Kerr jars labeled "P2P" (P2P was identified as phenylacetone, a precursor of methamphetamine and amphetamine); two Kerr jars containing a dark liquid; one brown bottle labeled "mecuric chloride"; one separator funnel; three plastic jugs labeled "ether" in the freezer; one vacuum pump; one electric stirrer; one plastic gallon jug labeled "methylamine 40%"; one tripleneck 5000 milliliter flask; one glass condenser; one 5 gallon can labeled "ether"; one plastic gallon jug containing a yellowish substance; and a police radio scanner.

A chemistry book and a spiral notebook were found in appellant's car. The notebook contained what was identified as directions for various ways to manufacture methamphetamine; lists of chemicals and equipment consistent with those used to manufacture methamphetamine; notes on "1st cook P2P" and "2nd cook P2P" and on different attempts to manufacture methamphetamine; diagrams of a building and chemical equipment; and tables of the capacity of different pieces of chemical equipment.

Department of Public Safety Officer Carl Russell Garver testified that a "cooking laboratory" was found inside the warehouse. Officer Garver found a Coca-Cola machine with a large glass front window. Inside the Coca-Cola machine was a 5000 milliliter triple-neck flask with a heating unit connected to a reostat (which controlled the temperature of the heating unit) and "several condensers coming up from the flask attached to water hoses coming back from the bathroom." The fluid inside the flask was boiling. Also found in various rooms of the warehouse were the following: 50 gallon drums containing acetic anhydride, acetone, methanol, and various corrosives; a 125 milliliter Pyrex container; a set of scales; a plastic container of white powder; and containers of various chemicals. Officer Garver testified that the only

business appeared to be that of a laboratory.

Eddie Lee Dickie, chemist for the Texas Department of Public Safety, identified the entries in appellant's notebook that were labeled "1st cook P2P" and "2nd cook P2P" as containing the formula for manufacturing methamphetamine. The entries labeled "12/15/84" and "12/20/84" contained the formula for manufacturing P2P. The "12/15/84" entry contained, after the formula for P2P, the following remarks: "Removed added meth (illegible word) PH 10 No Good." Dickie testified that in order to manufacture methamphetamine, P2P must first be manufactured. Methylamine is then added to the P2P, and the chemicals are "cooked" to produce methamphetamine.

Dickie testified that the chemical methylamine was an essential ingredient in the manufacture of methamphetamine. The chemical labeled "methylamine 40%" and found in the warehouse was in fact dimethylamine. While methylamine and dimethylamine look and smell the same, methamphetamine cannot be manufactured with dimethylamine. The mislabeled container was the type of container in which methylamine is normally stored. Dickie determined that the contents of the container was dimethylamine, not methylamine, only by using sophisticated electronic equipment.

Dickie also testified that the only drug he knew of which could be produced from the combination of P2P and methylamine was methamphetamine. The results of combining P2P and the dimethylamine that appellant had would be "a bunch of mixtures of compounds which are worthless."

There is a distinct odor associated with the manufacture of P2P and of methamphetamine. Dickie observed two sets of green tubing connected to the triple-neck flask in the altered Coca-Cola machine. The liquid boiling in the flask was P2P. One set of tubing went from the water connections in the bathroom through the warehouse to the flask. The other set of tubing went from the flask back through

the warehouse and down into the sewer. This set of tubing was connected in such a manner that the odor from the flask would be carried down the sewer and away from the warehouse. Byron Max Courtney, a chemist and witness for appellant, testified that a "set-up" such as the flask, heating unit, and reostat in the altered Coca-Cola machine with the tubing would "aid in hiding the smell."

Lane Burgess, an oil and gas producer, testified on behalf of appellant that appellant operated an oil testing chemical laboratory in the warehouse.

In Dickie's opinion, the warehouse was an operating or operational clandestine illegal drug laboratory. The chemicals and equipment found in both the trailer house and warehouse were not by themselves unusual. However, Dickie stated that these chemicals and equipment were not normally found in a combination such as this. Other chemicals would normally be found in addition to those in the warehouse. The only other times that Dickie had seen this combination of chemicals was in clandestine methamphetamine or amphetamine laboratories.

Based on the amount of P2P in the warehouse, Dickie stated that appellant had the capacity to manufacture between 450 and 500 grams of methamphetamine. The laboratory was equipped with a 5000 milliliter triple-neck flask. A 3000 milliliter triple-neck flask is able to produce 2½ pounds of methamphetamine in 72 hours. The street value of 2½ pounds of methamphetamine at the time of trial was approximately $250,000.

■ Appellant contends that the evidence is insufficient to establish the offense of attempted aggravated manufacture of methamphetamine because the evidence is uncontradicted that he lacked the essential ingredient, methylamine, to manufacture methamphetamine. Therefore, he argues he could not have committed an offense. We disagree.

Appellant was convicted under the Texas Controlled Substances Act, TEX.REV.CIV. STAT.ANN. art. 4476–15 et seq. (Vernon Supp.1986). Section 4.011 of the Controlled Substances Act provides that the offense of criminal attempt defined in TEX. PENAL CODE ANN. sec. 15.01 (Vernon Supp. 1986) applies to aggravated offenses under the Controlled Substances Act. Penal Code Section 15.01 states in part:

(a) A person commits an offense if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended.

(b) If a person attempts an offense that may be aggravated, his conduct constitutes an attempt to commit the aggravated offense if an element that aggravates the offense accompanies the attempt.

There is sufficient evidence that appellant attempted to manufacture methamphetamine. The laboratory was found to be operating with equipment capable of producing more than 2½ pounds of methamphetamine in 72 hours and with enough P2P to produce 450 to 500 grams of methamphetamine. Section 4.03(c) of the Controlled Substances Act provides that manufacturing of methamphetamine is an aggravated offense where 28 or more grams are produced.

■ Appellant also argues that the evidence is insufficient to support the conviction because under the language of Sections 4.03(a) and (c) of the Controlled Substances Act, it is impossible for there to be an offense of "attempted" aggravated manufacture. Appellant contends that for the offense to be aggravated as defined by Section 4.03(c), methamphetamine must actually be manufactured in violation of Section 4.03(a). We disagree.

Section 4.03(c) provides that:

A person commits an aggravated offense if the person commits an offense under Subsection (a) of this section and the amount of the controlled substance manufactured, delivered, or possessed with intent to manufacture or deliver is,

by aggregate weight, including any adulterants or dilutants, 28 grams or more. Section 4.03(a) states that:

Except as authorized by this Act, a person commits an offense if he knowingly or intentionally manufactures, delivers, or possesses with intent to manufacture or deliver a controlled substance listed in Penalty Group 1.

Methamphetamine is listed in Penalty Group 1.

Penal Code Section 15.01(b) specifically addresses appellant's argument. Pursuant to Section 15.01(b), the offense of attempting to commit an aggravated offense occurs when an element which aggravates the offense accompanies the attempt. The volume or amount is the element under Section 4.03(c) of the Controlled Substances Act which aggravates the offense of manufacturing methamphetamine as defined by Section 4.03(a).

We disagree with appellant's argument that actual manufacture of methamphetamine must occur before the offense of attempted aggravated manufacture can be committed. Under appellant's reasoning, there could be no criminal attempt of the offenses of aggravated rape, as formerly defined in TEX. PENAL CODE ANN. sec. 21.03 (repealed 1983), now codified as aggravated sexual assault, TEX. PENAL CODE ANN. sec. 22.021 (Vernon Supp. 1986); aggravated sexual abuse, as formerly defined in TEX. PENAL CODE ANN. sec. 21.05 (repealed 1983), now also codified as aggravated sexual assault, TEX.PENAL CODE ANN. sec. 22.021 (Vernon Supp. 1986); or aggravated robbery as defined in TEX.PENAL CODE ANN. sec. 29.03 (Vernon 1974). These statutes provide that the offense is aggravated when: (1) the offense of rape or sexual abuse (now both defined as sexual assault) or robbery, as defined in the Penal Code, is committed; and (2) one of the aggravating elements occurs. See *Ex parte Prophet*, 601 S.W.2d 372 (Tex.Cr.App.1980, en banc); *Simmonds v. State*, 645 S.W.2d 652 (Tex.App.—Fort Worth 1983, pet'n ref'd). The wording of Section 4.03(c) is essentially the same as these other aggravated offense provisions. Appellant's argument is inconsistent with the provisions of Penal Code Section 15.01(b).

If the contents had been as labeled, appellant had the chemicals and equipment to produce more than 28 grams of methamphetamine. The evidence is sufficient to support the conviction.

■ Copies of invoices for various chemicals and equipment purchases from Metroplex Chemical Company in Dallas, Texas, were introduced into evidence. Attached to each invoice was an "intelligence report" or "report of investigation" which named appellant as the purchaser, identified his vehicle, and listed the items purchased. The reports were compiled by Federal Drug Enforcement Administration (DEA) agents who observed the purchases.

DEA Agent Robert C. Chester, Jr., testified that Metroplex Chemical Company was acting in cooperation with the DEA in an undercover operation named "Dry Gulch." The purpose of "Dry Gulch" was to identify clandestine manufacturers of illegal drugs.

DEA agents assigned to "Dry Gulch" observed the business transactions at Metroplex Chemical Company through hidden cameras, obtained and copied the invoices from each transaction, compiled an "investigation" or "intelligence" report on each transaction, and attached the report to a copy of the invoice. The invoices and attached reports were kept under the care, custody, and control of Agent Chester. The invoices and reports were properly admitted as business records of the DEA. TEX.REV.CIV.STAT.ANN. art. 3737e (Vernon Supp.1986). Appellant's fourth ground is overruled.

■ In his third ground of error, appellant argues that his oral statements made during custodial interrogation were improperly admitted into evidence. We agree.

Department of Public Safety Officer Dennis Riggins testified on voir dire that appellant was arrested as he left his car at the club. Several officers were present at

the arrest. Officer Riggins drew his gun and pointed it at appellant at this time. Officer Riggins was unsure if the other officers pointed their guns at appellant.

During the search of the trailer house, Officer Riggins testified that appellant stated that he was in financial trouble and that he was "cooking" methamphetamine in order to resolve his financial trouble. Officer Riggins testified that appellant made these statements voluntarily, not in response to any questions. On voir dire, Officer Riggins stated that during the search appellant talked freely about his businesses and about the chemicals and equipment in the trailer house and that appellant's statements were made as a result of "general conversation" and not in response to questions from any of the officers present.

However, Officer Riggins admitted on voir dire that he asked appellant questions about the operation "part of the time." At some point during the search, he questioned appellant as to whether appellant owned the trailer house and warehouse. Also at some point during the search, appellant's son arrived at the trailer house. Appellant observed Officer Riggins advise appellant's son of his constitutional rights and question him. Officer Riggins then came back into the trailer house and questioned appellant about any involvement that his son might have had in the laboratories. Appellant answered that he was the only one involved and that his son had nothing to do with the laboratories.

It is undisputed that appellant was in custody at the time the statements were made. The question is whether interrogation occurred. TEX.CODE CRIM.PRO. ANN. art. 38.22, sec. 3 (Vernon Supp.1986) prohibits the admission of oral statements as a result of custodial "interrogation" unless an electronic recording is made. No recording was made in the present case.

Appellant filed a pre-trial motion to suppress "any and all statements" made as a result of custodial interrogation. The prosecuting attorney determined for the first time that the statements were admissible after he talked with Officer Riggins a few days before trial. Appellant's attorney objected at trial on the same grounds stated in his motion to suppress and on the basis of surprise.

The Court of Criminal Appeals in *McCrory v. State*, 643 S.W.2d 725 (Tex.Cr.App. 1982), adopted the standard set forth by the Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), for determining when interrogation occurs. The Supreme Court stated that:

> We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to *either express questioning or its functional equivalent.* That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. (Emphasis added)

In both the *McCrory* and *Innis* cases, express questioning was not involved, and those cases turned on whether the functional equivalent of questioning occurred. The facts of the present case are similar to the facts in *Wortham v. State*, 704 S.W.2d 586 (Tex.App.—Austin 1986, no pet'n), where defendant's statements were made as an "afterthought" to such questions by police officers as "why did you do this" and "do you care to talk to us about this now." In the present case, appellant was asked express questions about the operation at the trailer house which constituted interrogation pursuant to *Rhode Island v. Innis*, supra.

The State relies on *Stevens v. State*, 671 S.W.2d 517 (Tex.Cr.App.1984), and *Sanchez v. State*, 589 S.W.2d 422 (Tex.Cr.App.1979). In both *Stevens* and *Sanchez*, the statements were made as each defendant was apprehended and before any interrogation occurred. The record in the instant case fails to establish that the oral statements

were made before the officer asked appellant questions concerning the operation.

 The State contends that the error, if any, in admitting the statements was harmless. The test for harmless error is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction or affected the punishment. *Self v. State,* 709 S.W.2d 662 (Tex.Cr.App.1986). It is reasonably possible that the admission of appellant's statements affected the jury's decision. We find that the error in admitting the statements was not harmless beyond a reasonable doubt. Appellant's third ground is sustained.

The judgment of the trial court is reversed, and the cause is remanded for a new trial.