Lee Everette HENSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–89–00220–CR.

Court of Appeals of Texas,
Dallas.

May 7, 1990.

Rehearing Denied July 20, 1990.

Discretionary Review Refused (Appellant)
Nov. 21, 1990.

Discretionary Review Refused (State)
Nov. 21, 1990.

J. Bryan Clayton, McKinney, for appellee.

Before STEWART, THOMAS and KINKEADE, JJ.

## OPINION

STEWART, Justice.

Lee Everette Henson appeals his jury conviction for the offense of murder. The jury assessed punishment at seventy-five years' confinement. In seven points, appellant contends that: (1) the evidence is insufficient to support his conviction; (2) the admission of the oral statement allegedly made by him while in custody constituted error; (3) the admission of his oral statements made to arresting officers was erroneous because the statements were the product of custodial interrogation or its functional equivalent; (4) the admission of his written statement constituted error because he did not make the statement freely and voluntarily; (5) the admission over objection at the punishment hearing of evidence concerning an unadjudicated offense involving assaultive conduct constituted reversible error; (6) the admission of a letter during the punishment hearing constituted reversible error since it revealed the nature and circumstances surrounding the plea negotiations; (7) the admission of a letter during the punishment hearing constituted reversible error since it revealed to the jury an extraneous offense and other matters not permitted by statute. We affirm appellant's conviction, but we reverse and remand the case to the trial court for further proceedings as to punishment.

## FACTS

Angela Stevens, the sixteen-year-old decedent, sneaked out of her bedroom on the night in question to meet appellant, whom she dated from time to time. Appellant, Angela, Stacia Morris, Rodney Kiser, and John Shores drove to Tickey Creek Park at Lake Lavon, where they drank wine coolers. Appellant and Angela injected methamphetamine; appellant also took mescaline. Everyone except appellant was in a

John H. Hagler, Dallas, for appellant.

good mood, and, after a while, appellant and Angela began to argue. Appellant and Angela stayed at the park while Kiser and Shores took Morris home. Appellant and Angela later saw Shores and Kiser, who wanted to go to a field in Altoga to look for marijuana. At some point after they arrived at the field, Angela was shot and beaten on the face; her body was discovered in the field eleven days later. Shores and Kiser turned themselves in, and each made a written statement implicating appellant in Angela's murder. Officers then obtained an arrest warrant and took appellant into custody. Appellant signed a written statement admitting his involvement in the murder, and he later told Billy Hugh Chandler, a family friend with whom appellant had lived off and on, that he had shot Angela.

## GUILT/INNOCENCE

■ In his first point, appellant complains that the evidence is insufficient to sustain his conviction. Specifically, appellant contends that neither the written statement nor the alleged oral statement to Billy Chandler were admissible and that, without them, there is insufficient evidence to support his conviction for the offense of murder. This specific contention is based on a false premise. In determining the sufficiency of the evidence, we must consider *all* evidence, whether or not properly admitted. *Deason v. State,* 786 S.W.2d 711 (Tex.Crim.App.1990). With this rule in mind, we consider the sufficiency of the evidence to support appellant's conviction.

■ In the indictment, appellant was charged with offenses contained in section 19.02(a)(1) and (2) of the Texas Penal Code, which provide in pertinent part:

(a) A person commits an offense if he:

(1) intentionally or knowingly causes the death of an individual; [or]

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; . . .

In reviewing the sufficiency of the evidence, this Court's inquiry is limited to determining whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Girard v. State,* 631 S.W.2d 162, 163 (Tex.Crim.App.1982). A reviewing court must position itself as a final due process safeguard, ensuring only the rationality of the fact finder. *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim. App.1988). The fact finder's verdict must stand unless it is found to be irrational or unsupported by more than a "mere modicum" of evidence. *Id.*

■ In a written statement and in an oral statement to Billy Chandler, appellant admitted shooting Angela. In the written statement, appellant also admitted that he, Shores, and Kiser had planned to kill Angela since sometime in June, 1988 and that on July 6, 1988 everything worked out to kill her that day. He further described the details of the killing and his participation in it. In addition to this evidence, the record reflects the following facts. Karen Stevens, Angela's mother, testified that on the night in question she heard a loud vehicle at the end of the road. Angela was not in her room the next morning. Investigators Denison and Norton later found a note in Angela's room that she had written, saying that she was with Shores and that she was going to meet appellant at the end of the road.

Morris, appellant's friend, testified that she was with Angela, appellant, Shores, and Kiser for about four hours on the night in question. They went to Tickey Creek Park at Lake Lavon and drank wine coolers. Everyone except appellant was in a good mood; appellant "was just kind of there—he was moody." After a while, appellant and Angela appeared to be arguing. About 4:00 a.m., Kiser and Shores took Morris home; appellant and Angela stayed at the park. Morris never saw Angela again.

Billy Chandler testified that the shotgun that killed Angela was his, that he kept the shotgun in his son's room, and that appellant shared this room with his son when

appellant lived with the Chandlers from time to time over the years. John David Chandler, Billy Chandler's son, testified that he looked for the shotgun after appellant was arrested, but it was gone. John Chandler and another witness testified that appellant said that he was going to kill Angela because she was a "narc".

Appellant testified in his own behalf. Appellant testified that he often did drugs, that his drug situation during the month that Angela was killed was "pretty bad", and that he frequently could not remember things. On the day in question, appellant woke up, took methamphetamine, and could not remember anything until he met Shores and they decided to meet Angela to buy drugs. Shores told appellant that he could get some money from his stepfather to buy drugs if he killed a cat that lived next door, so appellant and Shores went to the Chandler house and appellant spoke to Billy Chandler while Shores took the shotgun and put it in appellant's truck.

Appellant further testified that, when Shores and appellant picked up Angela on the night in question, she had methamphetamine and mescaline. Morris suggested that they go to Tickey Creek Park, where they drank wine coolers. Appellant got an upset stomach and laid in his truck until Angela awakened him because she wanted to "main line" methamphetamine; appellant took a mescaline pill and injected methamphetamine. Appellant and Angela were alone at the park after Shores and Kiser left to take Morris home. When appellant was taking Angela home, they passed Shores and Kiser, who suggested that they go to a field in Altoga to look for marijuana. While they were looking for marijuana, appellant's state of mind worsened and he began to hallucinate. Shores went to the truck, brought Chandler's shotgun to appellant, and told him "I want you to you know—do away with her, shoot her." Angela walked by, but Shores was in the way, so appellant decided to put the gun back in the truck. Angela asked appellant what he had, and he said nothing and threw the shotgun to the ground. Angela got in appellant's truck and said that she wanted to go home. The next thing appel-

lant remembered was sitting in the truck and seeing Angela laying in the field. Appellant denied that he told anyone that Angela was a "narc" or that he was going to kill her, said that he did not socialize with the witnesses who had so testified, and that he did not know why they would lie.

The jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex.Crim.App. [Panel op.] 1981). The jury is entitled to accept one version of the facts and to reject another. *Id.* We conclude that, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found that appellant murdered Angela beyond a reasonable doubt. Appellant's first point is overruled.

In his second point, appellant contends that the trial court erred in admitting an oral statement he allegedly made to Billy Chandler while appellant was in jail. Appellant maintains that Chandler was acting as an agent for the state at the time the alleged statement was made and, therefore, the statement was in response to custodial interrogation. The State replies that Chandler was not a police officer; consequently there was no custodial interrogation. The trial judge made the following finding of fact and conclusion of law regarding appellant's oral statement to Chandler: "21. Chandler was not solicited to question defendant about the offense. Chandler was not acting at the direction of the State, and was not acting as an agent of the [S]tate when he asked defendant about the shooting."

During the pretrial hearing, Chandler testified that he went to the county jail the day following appellant's arrest and talked to appellant. During their conversation, Chandler asked appellant if he had shot Angela and appellant answered, "Yeah, I did." The defense objected on the ground that Chandler was acting as an agent for the State and that the oral statement did not comply with the statutory requirements. The trial court overruled the de-

fense's pretrial and trial objections and allowed Chandler to testify before the jury that appellant had told him that he (appellant) had shot Angela.

An oral statement made pursuant to custodial interrogation is not admissible unless the requirements of article 38.22, section 3(a) of the Texas Code of Criminal Procedure are met. It is undisputed that those requirements were not met in this case. However, section 5 of article 38.22 allows the admission of "... a statement that does not stem from custodial interrogation...." If a statement does not stem from custodial interrogation, it is admissible against the accused on the question of guilt. *Chambliss v. State*, 647 S.W.2d 257, 263 (Tex.Crim.App.1983). In this case, the determination of whether appellant's statement was in response to custodial interrogation hinges upon whether Chandler was acting as an agent of the State at the time the statement was made. *See Cates v. State*, 776 S.W.2d 170 (Tex.Crim.App.1989); *Paez v. State*, 681 S.W.2d 34 (Tex.Crim. App.1984) (both involved investigators with the Texas Department of Human Resources).

■ In deciding whether a non-law enforcement questioner was acting as an agent of law enforcement, we must consider numerous factors in light of the existing circumstances. *McCrory v. State*, 643 S.W.2d 725, 727 (Tex.Crim.App.1982). The record as a whole must clearly establish that appellant's statements resulted from a calculated practice which all agents of the State involved knew was reasonably likely to evoke an incriminating response from him. *Cates*, 776 S.W.2d at 172 (citing *McCrory*, 643 S.W.2d at 743). In addition, we must consider whether Chandler was known to law enforcement personnel and whether it was reasonably likely that he would evoke or elicit an incriminating response within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). *Cates*, 776 S.W.2d at 173.

■ With these standards in mind, we turn now to a review of the relevant facts. Appellant argues that the following facts prove that Chandler was acting as an agent of law enforcement when he elicited appellant's admission that he had shot Angela. Chandler testified that he talked to Investigator Denison three times regarding Angela's disappearance; that the officer had visited him in his home twice; that Denison solicited his assistance in the case; and that based on his conversations with Denison, he (Chandler) was willing to aid the sheriff's office in the investigation.

The State counters with Chandler's testimony that, when appellant made the admission of guilt, Chandler had not been instructed by anyone to ask any particular questions and that he was not and never had been a police officer. The State argues that Chandler's vague passing references to his desire to provide whatever information he could to the police does not make him a "police agent," but merely a cooperative citizen.

We have carefully reviewed all of Chandler's testimony in the record. In addition to the facts relied on by appellant and the State, we find the following facts are also significant in determining whether Chandler was acting as an agent of law enforcement when he visited appellant in jail. Chandler knew both appellant and Angela personally. Appellant had lived in Chandler's home continuously during his freshman year in high school and had stayed with the Chandler's off and on during the spring prior to the murder in July 1988. Angela and her family were neighbors of the Chandlers, and Angela often stayed at Chandler's house visiting his daughter. Chandler also had a son about appellant's age, and they both worked at the same muffler shop in Plano.

Chandler expected appellant to be arrested for questioning because Denison had told him that he had picked up several people in the Princeton area for questioning. The night before appellant's arrest, Chandler told appellant to expect to get picked up and gave him instructions. The next day, appellant was arrested and, after

giving his statement at the jail, told Denison that he wanted to call Chandler. Denison already knew Chandler, and he placed the call and told Chandler that appellant had been arrested for murder and that he had made a full confession. Appellant then got on the phone and confirmed the fact that he was in jail on a murder charge and asked Chandler to call his father.

Chandler testified that he visited appellant at the jail the day after his arrest because Chandler considered appellant a part of the family and, like any other family member, he went to visit him; that they talked about appellant's "general well-being as to whether he was taken care of, if he had been abused and so forth;" and that Chandler then asked appellant if he had shot Angela and appellant said, "Yeah, I did." Chandler said that he asked that question because he "wanted to hear it from [appellant] that he was in there for a valid reason and not just being picked up." Chandler also testified later that he asked the question because he wanted to hear it from appellant's mouth; he did not want hearsay; he wanted appellant to tell him directly.

On cross-examination, Chandler testified that before he visited appellant at the jail he had spoken to Denison three times, twice at his home and once on the telephone the day appellant was arrested, and that the first time Denison came to his home the officers were looking for Angela when she was missing and maybe they were looking for appellant. At that time, Denison asked Chandler if he knew appellant's whereabouts on the night that Angela had disappeared and he did not, but Chandler told Denison what appellant had told him had taken place, and he (Chandler) believed exactly what appellant had told him. Chandler said that the second time Denison and another officer came to his house was the day before appellant was arrested and that he spoke with them. Chandler further stated that on the two occasions that he spoke to Denison (at his home), he was endeavoring to be cooperative and to aid Denison in his investigation to determine the whereabouts of Angela; that Denison was soliciting his help in this regard; that when Denison questioned him about appellant's whereabouts on the night of Angela's disappearance and when he told Denison what appellant had told him had taken place, he was endeavoring to help the sheriff's deputies in this regard. Chandler also stated that when he talked to Denison, his attitude was that of aiding Denison in his investigation to any degree necessary and that he still was of this mind and attitude at the time he visited appellant at the jail.

Chandler's testimony also reflects that, when he talked to appellant at the jail, there were no police officers there overseeing him or directing his conversation with appellant; that at that time he was not acting at Denison's direction in trying to ferret out information from appellant about the shooting; that Denison had not asked him to get appellant to admit to him at the jail that he had shot Angela; that he had no idea how Denison learned what his conversation with appellant was at the jail, but Denison knew; that when he went back home, several friends and neighbors were there, he was very emotionally upset, and he told them what appellant had told him; that he assumed that someone at the gathering had told Denison about the conversation; and that a few days later, Denison asked him if appellant had made a statement and he gave Denison a statement recounting the conversation with appellant.

Chandler testified, and the trial court found, that he was a family friend of appellant and had allowed appellant to live in his home from time to time. Chandler spoke to appellant by telephone the day that he was arrested and met appellant the next day in the Collin County jail visiting area. Chandler asked appellant if he had shot Angela and appellant replied, "Yes, I did"; no other questions or discussions were had concerning the offense. Chandler was not solicited to question appellant about the offense and was not acting at the direction or as an agent of the State when he asked appellant about the shooting.

Based on the above uncontroverted facts, we conclude that the record supports the trial court's findings that Chandler did not

act as an agent of the State when he visited appellant in jail and elicited appellant's admission of guilt. The evidence shows that Chandler went to the jail on his own out of concern for appellant's welfare. Chandler already knew that appellant had confessed to the murder, but he wanted to hear it directly from appellant and to be sure that appellant had not been abused. Chandler had not provided information to the officers that resulted in appellant's arrest, nor was he conducting a criminal investigation in any official capacity as was the Department of Human Services ("DHS") investigator in *Cates*, 776 S.W.2d at 174. Chandler also did not report appellant's admission to Denison immediately as did the DHS investigator in *Cates*. *Id.* Denison apparently found out about appellant's statement from a third party and asked Chandler about it a few days later.

Thus, there is no evidence that appellant's statement resulted from a calculated practice which Denison or other officers knew was reasonably likely to evoke an incriminating response from appellant. *McCrory*, 643 S.W.2d at 734. Indeed, there is no evidence that law enforcement personnel were even aware that Chandler was going to visit appellant in the jail. Finally, regarding Chandler's testimony that, in speaking with the officers he wanted to cooperate and aid them in their investigation to any degree necessary, we agree with the State that these were statements of a cooperative citizen and that they were not evidence that Chandler was a "police agent."

Because we conclude that Chandler was not acting as an agent of the State when appellant's oral statement of guilt was made, we hold that this statement was not in response to custodial interrogation. Accordingly, the statement was admissible under section 5 of article 38.22 of the Texas Code of Criminal Procedure. Appellant's second point is overruled.

In his third point, appellant contends that the trial court erred in admitting oral statements made to arresting officers because they were the product of custodial interrogation or its functional equivalent. Deni-

son testified that appellant was arrested pursuant to a warrant at his place of employment and transported to jail. Denison further testified that he did not question appellant during transport and that appellant made spontaneous statements that Kiser and Shores "would straighten out the mistake. They had all been with Angela the night she had ran [sic] away from home, but [appellant] and Angela had got [sic] into an argument at the Allsup station and Angela got in the car with some other guys and left, and that was the last time that he had saw [sic] her." Appellant urges that the State did not meet its burden to prove that the above statements were not the product of the functional equivalent of custodial interrogation.

■ As previously stated under point number two, an oral statement is admissible pursuant to article 38.22 of the Texas Code of Criminal Procedure if it is not the product of custodial interrogation. *See May v. State*, 618 S.W.2d 333, 348 (Tex. Crim.App.1981). Because appellant was clearly in custody when he made the statement to Denison, the question is whether the statement resulted from interrogation. Interrogation refers not only to express questioning, but also to any words or actions on the part of police that they should know are reasonably likely to elicit an incriminating response from a suspect. *Innis*, 446 U.S. at 298, 100 S.Ct. at 1688. Thus, the fact that Denison testified that he did not direct questions to appellant is not dispositive. *See McCrory*, 643 S.W.2d at 734.

■ The cases cited by appellant to support his contention that his statements were the result of custodial interrogation are distinguishable from this case. In *Wortham v. State*, 704 S.W.2d 586 (Tex. App.—Austin 1986, no pet.), the officer described the accused's oral statement as an "afterthought" expressed during a "conversation" and acknowledged that he had questioned the accused on the way to jail. The court concluded that the statement was the product of interrogation or its functional equivalent. In *Baxter v. State*, 718 S.W.2d 28 (Tex.App.—Eastland 1986,

pet. ref'd), the officer testified that the accused's statements were the result of "general conversation" and not in response to any questions. The court found that the statements resulted from custodial interrogation or its functional equivalent. In *Baxter* and *Wortham*, testimony indicated that the suspects' statements were made in response to conversation or questioning initiated by law enforcement personnel. In this case, during the suppression hearing, Denison testified on direct examination that there was no questioning of appellant en route to McKinney from the point of his arrest.[1] On cross-examination, Denison stated that he did not talk with appellant on the way to the sheriff's department, but that appellant talked to him; that he got appellant in the squad car and said nothing to him; that he had no idea what prompted appellant to make the statement to him to the effect that he (Denison) was making a mistake; and that he did not talk to appellant in response to this statement. None of Denison's statements were controverted. Under these facts, the State met its burden to prove that appellant's statement was not the product of custodial interrogation or its functional equivalent. Appellant's third point is overruled.

In his fourth point, appellant contends that the trial court erred in admitting his written confession because it was not freely and voluntarily given. Specifically, appellant alleges that his written statement was involuntary because he was interrogated for about two hours before he signed the statement, the statement was handwritten by Denison, and Denison had spoken with Shores and Kiser, his co-defendants, prior to preparation of the statement. Additionally, appellant contends that he never read the statement and that he signed it only because Denison told him to do so.

The record reflects that the trial court held a *Jackson v. Denno*[2] hearing to determine the admissibility of appellant's written statement. The only evidence concerning appellant's written statement adduced at the suppression hearing was the testimony of Denison, the person to whom the statement was made. Since the evidence at the suppression hearing was uncontroverted, the determination of the voluntariness of appellant's written statement must be based on the totality of the circumstances. *Dunn v. State*, 721 S.W.2d 325, 336 (Tex. Crim.App.1986). The trial judge ruled that appellant's written confession was admissible at trial and later filed findings of fact and conclusions of law that appellant's written statement was voluntary.

At the suppression hearing, Denison testified that he had questioned Shores and Kiser three days after Angela's body was discovered; that they had made statements incriminating appellant in Angela's murder; and that, based on the written statements signed by Shores and Kiser, he obtained an arrest warrant. Denison arrested appellant, gave appellant his *Miranda*[3] warnings, and drove appellant in a squad car to the Collin County jail. Although Investigator Denison did not question appellant during transport, appellant made several spontaneous comments that he had been with Angela on the night in question, that they had argued at an Allsup station, that she had left in a car with "some guys," that he had not seen Angela again, and that Shores and Kiser would straighten out everything. At the jail, Denison again read *Miranda* warnings to appellant, who signed his initials next to each warning to indicate that he understood it. Denison then questioned appellant, who later agreed to make a written statement. Denison and appellant "went through the whole situation and talked about it, and then [Denison] wrote down what [appellant] told [him] to keep it in the order, the way things happened." Officer Denison then prepared a narrative statement in his handwriting, read the statement aloud to appellant, and gave the

---

1. Appellant was arrested at his place of employment in Plano, Texas.

2. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (confession or admission cannot be used as evidence until trial judge determines, out of the presence of the jury, that it was voluntarily made).

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

statement to appellant to read, although he did not know whether appellant actually read it. At the top of the first page of appellant's written statement were five warnings which were read to appellant and initialled "L.H.", indicating that he understood the warnings and voluntarily waived his rights. Appellant also initialled several places in the document and signed his name at the bottom of each page. Although Denison already knew most of the information contained in appellant's written statement from his previous interviews with Shores and Kiser, he testified that appellant's statement was free, voluntary, and true. Denison further testified that he neither threatened, beat, nor struck appellant and that appellant never requested to terminate the interview. After appellant signed the written statement, he asked to call Chandler; the request was granted.

The trial judge made the following findings of fact and conclusions of law regarding the voluntariness of appellant's written statement.

3. Immediately following his arrest, the defendant was read his Miranda warnings from a $3 \times 5$ card. ([T]he card itself was not introduced into evidence). No interrogation occurred at that time.

4. During the drive from Plano to McKinney, Texas, the defendant volunteered a story whereby he claimed that two of his friends, John Shores and Rodney Kiser could verify a story that would show that he had not done anything.

5. At some point, Investigator Larry Denison then told the defendant that Shores and Kiser were already under arrest and is [sic] in custody at the Collin County Jail. The defendant then replied, "well you've got me then."

6. After arriving at the Collin County Jail, the defendant was taken to an office area and interviewed by Investigator Larry Denison. Denison advised defendant that Shores and Kiser had implicated him in the murder of Angela Stevens.

7. During the interview, and prior to making a statement, Investigator Denison advised the defendant that he had

the right to remain silent, that anything the defendant said could and would be used against him in court, that defendant had the right to talk to a lawyer and have that lawyer present during questioning, that if defendant could not afford a lawyer, one would be appointed to counsel defendant prior to and during any questioning if defendant so desired, and that defendant could stop the questioning at any time and request one.

8. Investigator Denison is the person to whom the statement was made by the defendant. The statement is attached hereto.

9. The defendant appeared to understand the warnings. He was not intoxicated, tired, sick, or in any way incapacitated, so far as the investigator could determine.

10. The warnings given by Investigator Denison are also shown, in writing, on the face of the written statement that was given by the defendant.

11. The defendant placed his initials beside each warning after reading the warning.

12. The defendant knowingly, willingly, voluntarily, waived his rights and gave a written statement.

13. The statement was freely given, without promises, fear, threats, coercion, or favor. The defendant initialed a paragraph in the written statement expressly stating this fact.

14. Throughout the interview and obtaining of the statement, the defendant did not request a lawyer and did not request the termination of the interview.

15. The only apparent inducement that resulted in defendant changing his story was the knowledge that co-defendant [sic] Shores and Kiser had implicated defendant in the murder and were, at the time of the interview, in custody at the Collin County Jail.

 The admissibility of a criminal defendant's written statement is governed by article 38.22, section 2(a)(1)–(5) of the Texas Code of Criminal Procedure. Appellant's written statement shows on its face that he received the requisite warnings list-

ed in article 38.22, section 2(a)(1)–(5); his initials indicate that he understood and waived his rights. The fact that appellant's statement was handwritten by Denison does not negate its voluntariness since the law does not require that a confession be in the exact language of the accused. *Bell v. State*, 724 S.W.2d 780, 793 (Tex. Crim.App.1986). Also, the mere passage of one to two hours between appellant's arrest and his confession does not decrease the likelihood that his confession was voluntarily given. *See e.g. Cox v. State*, 644 S.W.2d 26, 28–29 (Tex.App.—Houston [14th Dist.] 1982, pet. ref'd) (defendant questioned for eight hours over period of two days). Appellant cites no authority for his contention that his statement was involuntary because Investigator Denison had learned most of the details contained in appellant's statement through previous interviews with Shores and Kiser, nor does appellant establish how the investigator's prior knowledge of the facts affected the voluntariness of appellant's statement. Whether appellant read the statement before he signed it does not affect its voluntariness because the uncontroverted evidence is that Investigator Denison read the statement aloud to appellant and that appellant was given the opportunity to read the statement and to make changes before he signed it. Finally, appellant's contention that he signed the statement only because Denison told him to is simply a factual statement which the trial court could accept or reject. The record shows that appellant received *Miranda* warnings several times and that he understood those rights. The record does not reflect any coercive activity on the part of Denison or any other investigator which would compromise the voluntariness of appellant's signing of the statement.

Denison remained firm during direct and cross-examination in his testimony that appellant's statement was voluntary. Appellant offered no evidence to the contrary at the suppression hearing. We conclude that, under the totality of the circumstances, the evidence supports the trial court's finding that appellant's confession was freely and voluntarily given after he had been fully apprised of and had affirmatively waived his rights. Appellant's fourth point is overruled.

## PUNISHMENT

In his sixth and seventh points, appellant contends that the trial court's admission of State's Exhibit 12 during the punishment phase of the trial was reversible error. Exhibit 12 is a letter that appellant wrote to an acquaintance on November 28, 1988 while in jail awaiting his trial, which began on December 5, 1988. The State offered the letter in its case in chief at the punishment phase through Christi Casey, who was the recipient of the letter. The trial court admitted the letter over objections that it was not an appropriate subject of inquiry during the punishment hearing; that it contained matters regarding plea negotiations and appellant's reaction to such negotiations, and that its prejudicial effect outweighed any probative value.

In these two points, appellant complains of the following portions of the letter:

Christi, Hey Girl! How's life treating you? Not to [sic] good here. Yeah, they really got my ass! They offered me 50 yrs [sic] and I told them to stick that in their ass, so they said if I take it [to] court I would probably get 99 or life! That's a long fucking time! [Point six]

\* \* \* \* \* \*

Yeah, you will never believe this, Bill Chandler testified against me!!⁴ No bullshit. He told them I said I shot Angela! That's bullshit, I have never told anyone that. I'm in a bad spot right now. Me & Britt and John might have something going but it is a secret, but you will find out soon enough.

Well, girl, I'm gonna let you go. Remember, I'm not mad at you unless you betray me. O.K. So don't. [Point seven]

4. Appellant is apparently referring to Bill Chandler's testimony on November 28, 1988 during the pretrial hearing on appellant's motion to suppress.

Under point six, appellant contends that the statements in the first excerpt quoted above are inadmissible under rule 410 of the Texas Rules of Criminal Evidence, which excludes evidence of pleas, plea discussions and related statements. He also contends that this portion of the letter is inadmissible under article 37.07, section 3(a) [5] of the Texas Code of Criminal Procedure. *Murphy v. State,* 777 S.W.2d 44 (Tex.Crim.App.1988) (opinion on reh'g). Under point seven, appellant contends that the second excerpt quoted above is inadmissible because it also revealed matters not permitted by article 37.07, section 3(a). *Id.*

Article 37.07, section 3(a) at the time of trial read in pertinent part as follows:

(a) Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to the prior criminal record of the defendant, his general reputation and his character.

We agree with appellant that both excerpts quoted above are inadmissible under former article 37.07, section 3(a); therefore we need not address appellant's contention that the first excerpt is inadmissible under rule 410 of the Texas Rules of Criminal Evidence.

▮▮▮ At the punishment stage, the circumstances of the offense itself and of the defendant himself are admissible. *Murphy,* 777 S.W.2d at 63 (citing *Stiehl v. State,* 585 S.W.2d 716, 718 (Tex.Crim.App. 1979)). One circumstance of the defendant is his character. *Id.* The admissibility of evidence of character *per se* is governed by article 37.07, section 3(a); at the time of appellant's trial this section limited the form of character evidence to prior criminal record, and *opinion or reputation* testimony. *Id.* at 61. Accordingly, former article 37.07, section 3(a) precluded admission of specific conduct to show character. *Id.* at 64. Likewise, although this statute did not limit evidence of an offender's circum-

stances to "character" evidence, it also precluded evidence of specific acts of conduct to prove any other circumstance of the offender, either in mitigation or aggravation of punishment. *Id.*

The letter at issue was written by appellant. Hence, all of the statements in the letter are appellant's written utterances. Oral or written utterances of an accused may constitute evidence of his or her state of mind. 2 J. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 425 (Chadbourn rev. 1979). At the punishment stage, appellant's state of mind a few days before trial was relevant only to the issue of his character. Indeed, as set out below, the prosecutor argued that the letter showed appellant's true colors and his attitude. The letter, as character evidence, is not in one of the three forms allowed under former article 37.07, section 3(a) and, therefore, the letter was inadmissible as proof of appellant's character. *Murphy,* 777 S.W.2d at 61.

Further, appellant's written utterances are evidence of specific conduct. To the extent that these utterances might be relevant to some circumstance of appellant, other than his character, they would also be inadmissible under former article 37.07, section 3(a). *Id.* at 64.

However, the State contends in response to appellant's sixth point that the first excerpt quoted above is admissible because it "was relevant to rebut appellant's statements during the guilt phase of the trial that he was 'totally different feeling than what I am now' at the time of the offense." We must examine the context of this statement to discern its meaning. On direct examination at the guilt stage, defense counsel asked the following questions and appellant made the following responses:

Q. Okay. Now, you have been in jail since July 21, is that right?

A. Yes, sir.

5. Code of Criminal Procedure, ch. 385, § 19, 1987 Tex.Gen. Laws 1898, *repealed by* Code of Criminal Procedure, ch. 785, § 4.04, 1989 TEX. SESS.LAW SERV. 3493 (Vernon), Acts 1987, 70th Leg., ch. 385, § 19, eff. Sept. 1, 1987, hereafter referred to as article 37.07, section 3(a). Al-though section 3(a) has since been amended, TEX.CODE CRIM.PROC.ANN. art. 37.07, § 3(a) (Vernon Supp.1990), the section as it existed pursuant to the 1987 amendment controls this cause, which was tried in 1988.

Q. How many months is that?

A. Um—I think right around five months.

Q. Okay, has a good portion of that time you have spent in jail, have you been in solitude by yourself in a cell?

A. Yes, sir.

Q. Have you had an opportunity to clear your head of drugs since July?

A. Yes, sir.

Q. Have you had an opportunity to look back on those situations?

A. Yes, sir.

Q. Okay. How would you describe to the jury what your situation, what your state of mind was back,—end of—in July, when you were arrested? [6]

A. Um—I don't know, just total of not all there. The fact that I was on drugs—I believe every day, *and totally different, you know, feeling than what I am now.* (Emphasis added.)

█ The State apparently contends that appellant put his state of mind at the time of trial generally at issue by the italicized statement above, thus opening the door to admission of his letter to prove that his state of mind had not changed since the time of the offense. We disagree. Viewed in context, the preceding questions established that his head was clear of drugs after five months' incarceration. We conclude that appellant was simply contrasting his current drug-free state of mind with his "just total of not all there" state of mind due to drugs at the time of his arrest.

█ In addition, we further conclude that, at the punishment stage, appellant's state of mind at the time of trial is irrelevant on any issue other than defendant's character. Although we agree that evidence otherwise inadmissible under former article 37.07, section 3(a) may become admissible if the opponent "opens the door," *Murphy,* 777 S.W.2d at 67,[7] appellant's statement that his state of mind in July was a "totally different feeling than what I

am now" is too vague and general to open the door to admission of his specific statements in the letter as proof of his character. Thus, the letter's contents remain inadmissible under former article 37.07, section 3(a), as we have previously held. We hold that the trial court erred in admitting the letter marked State's Exhibit 12. We must next determine whether the trial court's error is reversible.

█ Our current standard to judge reversible error is embodied in rule 81(b)(2) of the Texas Rules of Appellate Procedure which provides:

If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or punishment.

In *Harris v. State,* 790 S.W.2d 568 (Tex. Crim.App.1989), the court enunciated a procedure for determining whether an error is reversible under this rule. First, we must isolate the error and all its effects; second we must ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted. *Id.* at 587–88. In determining an error's effects, we must examine the source of error, its nature, whether or to what extent it was emphasized by the State, and its probable implications. *Id.* at 587. We must also consider how much weight a juror would probably place on the error and whether declaring the error harmless would encourage the State to repeat it with impunity. *Id.*

█ We consider the remaining properly admitted evidence only to uncover the potentially damaging ramification of the error. *Id.* at 585–86. In considering the untainted evidence, we are "obligated to examine the entire record in a neutral, impartial and evenhanded manner and not 'in the light most favorable to the prosecution....'" *Id.* (citations omitted). Fur-

---

**6.** We note that the question refers to appellant's state of mind at the time of his arrest, not at the time of the offense as reflected in the State's brief, quoted above.

**7.** *Accord, Drew v. State,* 777 S.W.2d 74, 76 (Tex. Crim.App.1989); *King v. State,* 773 S.W.2d 302, 303 (Tex.Crim.App.1989).

ther, although we should not determine harmfulness of an error by examining whether there is overwhelming evidence to support the defendant's guilt, its presence plays a determinative role in calculating as much as possible the probable impact of the error on the jury. *Id.* at 587.

■ Applying these standards to this case, we cannot determine beyond a reasonable doubt that the admission of the letter made no contribution to appellant's punishment. Although the record reflects overwhelming evidence of appellant's guilt, this factor is offset by the State's prejudicial use of the letter. We now examine the effects of the letter's admission. The prosecutor read the entire letter to the jury upon its admission. In addition, the prosecutor cross-examined appellant regarding various portions of the letter. Finally, the prosecutor made the following arguments, relied upon by appellant in points six and seven to show harm:

He [appellant] takes this trial in such cavalier form, the murder that he tells the State to—where they can put their plea negotiation offers and I suggest to you that Lee Henson,—even Lee Henson sitting over in jail has figured out what the appropriate punishment for murder is in Collin County. Especially in a vicious well planned murder such as this. He suggests in the letter that he will probably get ninety-nine or life and that is appropriate, because that is what this is worth. [Point six]

\* \* \* \* \* \*

Now, we have heard all this talk about Lee Henson's drug problem. Well, I will suggest to you as you go back in the jury room, you will read a letter that I have already read to you once but look it over again, a letter dated November 28, 1988, just a few days before the trial. This is the real Lee Henson that you see. Lee Henson has been in jail since July. Lee Henson, I submit to you is not cranked up, full of speed or dope or anything like that. This is Lee Henson's true colors. Do you remember in his letter he talked about the preacher, Mr. Chandler, betrayed him. How did he betray him. He

just told the truth. In Lee's mind, anybody that transgresses [sic] against him has betrayed him. Tells Christi Casey, tells her, can I trust you. You know, people are betraying me. Can I trust you. Will you betray me? I don't think you have, I trust you, so, don't. Implies a little threat and warning. [Point seven].

Other effects of the admission of the letter were the prosecutor's additional arguments that the letter showed how appellant talks in real life, in contrast to his "clean act" at trial; it showed what he thought of the trial and that what he thought "is a mockery of the whole thing" and that "this is certainly an appropriate case to give Mr. Henson exactly what he feels and knows Collin County juries think about murder.... Ninety-nine or life, ladies and gentlemen, I suggest to you is an appropriate verdict." Reference to the contents of the letter was the last sentence of the State's closing argument.

Because of the State's reliance on the letter during cross-examination of appellant at the punishment phase and during its subsequent closing argument, we conclude that a rational trier of fact might have reached a different verdict on punishment if the letter had not been admitted and its effects had not resulted. Accordingly, we hold that the admission of the letter was harmful error, and we sustain appellant's points six and seven. In light of our disposition of these points, we need not address appellant's fifth point, which also attacks evidence admitted at the punishment phase. We remand this case to the trial court for further proceedings, pursuant to article 44.29(b) of the Texas Code of Criminal Procedure.

## ON MOTION FOR REHEARING

KINKEADE, Justice, dissenting.

The majority holds that the trial court committed reversible error with its admission of State's Exhibit 12, a letter written by the appellant while in jail awaiting his trial. I respectfully dissent from that holding.

## POINT OF ERROR SIX

Even though the majority opinion does not address point of error six, my view of the case requires that I address it. Henson contends that the admission of his letter to a girlfriend constitutes reversible error. Henson complained of the portion of the letter which stated: "They offered me fifty years and I told them to stick that in their ass, so they said if I take it to court I would probably get 99 or life!" Henson objected because the comment contained references to plea negotiations and its prejudicial effect outweighed its probative value. The State argued that it was admissible under rule 410 of the newly adopted Texas Rules of Criminal Evidence. Under rule 410 of the Federal Rules of Evidence, containing the same language as Texas rule 410, for an accused's statements to be excluded they must have been made for the purpose of obtaining a concession from the government. Gratuitous remarks made without the intent to negotiate a plea are admissible. *See U.S. v. Ceballos*, 706 F.2d 1198, 1203 (11th Cir.1983). Henson's refusal of the State's offer of fifty years indicates that he had no intent to accept that plea offer. He merely recited what he claimed was the State's prediction of the sentence he would likely receive if he demanded his right to a trial. He mentioned no incriminating statements of his own. I would overrule Henson's sixth point of error.

## POINT OF ERROR SEVEN

I agree with the majority that Henson put his state of mind in issue when he responded to his counsel's question as to his state of mind at the end of July. I part company with the majority at that juncture because I believe Henson put his state of mind at issue generally and not just at the time of his arrest. The majority fails to consider Henson's entire testimony. When that consideration is made in this case, this statement by him about his state of mind plainly reflects that it is merely a part of the defense's overall strategy of mitigation. I believe Henson's entire testimony shows that the defense sought to use Henson's testimony during the guilt-innocence phase of trial about the influence on Henson by the older co-defendants and Henson's use of drugs and subsequent sobriety as mitigating circumstances. The evidence was a primer for what Henson knew would be the inevitable at the punishment phase of trial.

## FACTS

### *Guilt–Innocence Phase Of Trial*

The defense began its approach to mitigation through its direct examination of Henson during the guilt-innocence phase of trial. Henson stated that during his early years in high school he made good grades. He said he was elected Mr. Personality of Princeton High School two years in a row. Henson then stated all this changed when he began regular heavy usage of drugs. Henson described using a smorgasbord of drugs including methamphetamines, cocaine, crack, marihuana, and alcohol. He said these drugs frequently rendered him unable to remember things. As a result of this memory loss, he started failing his classes and ultimately dropped out of school. On the day in question, Henson admitted that he began ingesting drugs early in the day and continued to ingest and inject drugs throughout the day. In addition to Angela Stevens, the victim, Henson described a scene on the day of the murder controlled by his two older accomplices, ages nineteen and twenty. Henson claimed the drugs in his system destroyed any memory of killing Ms. Stevens. Henson claimed that the written statement he signed contains only information provided by the two co-defendants. He said that he only signed the statement because the police told him "things would go better if he cooperated." He stated that he was "hallucinating" that night, with his memory "coming and going." The events of that night are still not fully clear in his mind. Henson also admitted that during that entire summer he normally was high on some type of drug. The defense counsel then asked him how long he had been in jail. Henson responded that he had been in jail five months, with a good portion of that

time in solitary confinement. The following exchange then occurred between the appellant and his attorney:

Q: Have you had an opportunity to clear your head of drugs since July?

A: Yes, sir.

Q: Have you had an opportunity to look back on those situations?

A: Yes, sir.

Q: Okay. How would you describe to the jury what your situation, what your state of mind was back,—end of—in July, when you were arrested?

A: Um—I don't know, just total of not all there. The fact that I was on drugs—I believe every day, and totally different, you know, feeling than what I am now.

Later during the State's cross-examination of Henson, the following exchange occurred:

Q: Mr. Henson, if I understand you correctly, you are not guilty of this offense because you were a walking drug store along last summer?

A: That's right.

During closing argument, the State informed the jury of the following:

There is an instruction regarding the fact that voluntary intoxication is not a defense to criminal conduct. You have heard Mr. Henson get up here and talk about being a big drug addict. Well, that may be very true. He may be a big drug addict. I don't know, that is what we heard from him, anyway. If he is, that is no defense. No defense whatsoever. I want you to make sure that you understand and know that.

During closing argument, the defense attorney attempted to portray Henson as an unsophisticated youth made irrational and confused to the point of not knowing what was going on because of narcotics. The defense attorney also characterized Henson as being led astray by his older, more sophisticated co-defendants. The court's charge, which was not objected to by the defense counsel, clearly informed the jury that intoxication was not a defense. The only purpose of the defense's introduction of the evidence about the drug use of Hen-

son, the influence of the older co-defendants, and closing argument was for the jury to begin considering these mitigating circumstances during the guilt-innocence phase of trial anticipating the real war zone of this case, the punishment phase.

*Punishment Phase Of Trial*

The defense continued this approach to mitigation during the punishment phase of the trial. The State's first witness was the mother of Henson's girlfriend. She described Henson's behavior around the time of Ms. Stevens's disappearance. During cross-examination of the witness by the defense, the following exchange occurred:

Q: Mr. Prosecutor didn't ask you what the words messed up means to you. Tell the jury what you meant by that?

A: Yes, Lee had told me that he had taken some—

. . . . .

[Hearsay objection entered and overruled.]

. . . . .

A: Lee had told me that he had taken some blue pills, and later, he told me that they were, it was acid, that he had taken several hits of acid, is what he said.

Q: By virtue of his behavior, was there any doubt in your mind about that?

A: No, I knew that he was messed up that night. I knew he was.

The defense attorney further went on to question the witness about Henson's actions at the time. During the direct examination of a following witness, the State introduced the letter at issue. The defense attorney (1) generally objected to the letter as irrelevant or immaterial to any issue before the jury in this particular phase of the trial and (2) specifically objected to the mention of plea negotiations in the letter. The court overruled both objections.

Initially on appeal the State alleged that the letter was relevant to rebut Henson's above statement, during the guilt-innocence phase of trial, as to his state of mind both in July and at the time of trial. On rehearing the State alleges that the letter was

also introduced to rebut Henson's defensive theory of drug intoxication raised by Henson during the guilt-innocence phase of trial solely for the purpose of mitigation in the punishment phase. Apparently the State merely seeks to expand the reasoning behind its earlier argument, rather than setting out a new argument.

### Open Door

Former section 3(a) of article 37.07 of the Texas Code of Criminal Procedure allowed the admission of the defendant's character if the defendant "opens the door." *Murphy v. State,* 777 S.W.2d 44, 46 (Tex.Crim. App.1989); *Drew v. State,* 777 S.W.2d 74, 76 (Tex.Crim.App.1989); *King v. State,* 773 S.W.2d 302, 303 (Tex.Crim.App.1989). In *Murphy,* the court held that the defendant's answers to three questions to establish an initial right to probation did not "open the door" to the introduction of specific bad acts by the State. *Murphy,* 777 S.W.2d at 46. In *Drew,* the court held that the responsive testimony of a psychologist, as to defendant's nonthreat to society if placed on probation, did not "open the door" to *previous* testimony offered by the State of specific bad conduct. *Drew,* 777 S.W.2d at 76. In *King, after* the defendant affirmatively stated he could and would meet the terms of probation, if granted, the court held that the defendant "opened the door" to the State's *responsive* questions as to specific acts of misconduct. *King,* 773 S.W.2d at 303.

Henson's trial took place after the adoption of the Texas Rules of Criminal Evidence, which favor the admission of all logically relevant evidence for the jury's consideration. *Montgomery v. State,* Nos. 1090–88 & 1091–88, slip op. at 2 (Tex.Crim. App., May 30, 1990) (not yet reported). Furthermore, concomitant with adoption of the Texas Rules of Evidence, there should be a corresponding reluctance on the part of an appellate court to reverse trial court decisions which admit or exclude evidence. Courts and commentators universally recognize that with the enactment of federal rule 403, there was a conscious decision to give the trial court a considerable freedom in evaluating the probative value of the proffered evidence in relation to its prejudicial effect. *Id.* at 7. The court, affirming this court's opinion in *Montgomery,* specifically dealt with the trial court's admission of an extraneous offense. In a trial for indecency with a child, the defendant objected to the introduction of testimony that he had on several occasions paraded naked in front of his complainant minor daughters with an erect penis. The court held that even though the testimony did not fit *snugly* into any extraneous offense exception, the testimony was relevant evidence and the trial court's decision to allow its admission should be upheld. In this case, during the guilt-innocence phase of trial, the defense "opened the door" to Henson's character and state of mind at the time of the offense and, subsequently, through the date of the trial. In cross-examination during the punishment phase of trial prior to the introduction of the letter, the defense once again "opened the door" to the introduction of the letter with its request for answers from the witness about his taking of "acid" around the time of the victim's disappearance. The responsive offer of the letter by the State rebuts the defense's approach to mitigation, first begun during the guilt-innocence phase and continued during the punishment phase, that drugs and powerful, older companions caused Henson to kill. Clearly the letter shows the jury that five months later, with Henson now sober and free of drugs and in solitary confinement away from the influence of his older companions, his criminal state of mind remained unchanged.

Although the State only cites to Henson's answer during the guilt-innocence phase in response to the defense's question as to his state of mind during the end of July, when arrested, we should look at Henson's entire testimony during the guilt-innocence phase.

(1) Throughout Henson's testimony the defense sought to characterize Henson as the victim of drug abuse. He admitted using narcotics almost daily during the summer at issue. From the entire context of Henson's testimony

as to what he was like before drugs, while on drugs, and his state of mind five months after being off drugs, the defense attorney opened the door to state of mind evidence at least from the time of the arrest through the trial.

(2) The defense's approach to mitigation during the guilt-innocence phase demonstrated that Henson had good grades and was "Mr. Personality" prior to drug use. Then after he used drugs, he changed to a crazed zombie that committed crimes with only glimpses of a memory of them. That Henson, now sober and drug free, saw the error of his wicked ways making him a good candidate for mercy. All of these facts placed in evidence by the defense put Henson's state of mind into issue at least from the time of the offense through the date of trial.

(3) The defense's characterization of Henson, during the closing argument of the guilt-innocence phase, as unsophisticated and under the influence of older companions, opened the door to evidence of Henson's character.

The defense's affirmative pursuit of a trial with only mitigation evidence both during the guilt-innocence phase and during the punishment phase of trial opened the door for the introduction by the State of relevant evidence of Henson's character and/or state of mind at the time of the offense through the time of the trial. The letter at issue constitutes relevant evidence of both. Once Henson opened the door of evidentiary protection, the State may assault through that open door with all relevant evidence. The defense's question, set out above, as to Henson's state of mind should not be so narrowly construed, as the majority has done, to limit Henson's statements of state of mind to only the time of his arrest.

Through its approach of mitigation, characterizing Henson as an unsophisticated youth made irrational by drugs and led astray by his older more sophisticated co-defendants throughout the guilt-innocence phase of trial, the defense "opened the door" for the State's introduction of the letter into evidence during the punishment. The trial strategy of pleading not guilty, but offering no defense other than mitigation during the guilt-innocence phase of a trial, can be an effective strategy to prevent waiving any error that would have occurred by pleading guilty to an offense. But we must not allow a defendant to "open the door" during the guilt-innocence phase and expect it to close during the punishment phase of that trial. Because the defense "opened the door," we should uphold the trial court's decision to allow the admission of the letter into evidence. I would overrule Henson's seventh point of error and affirm the judgment of the trial court.